ANTHONY HUGHES, JOHN W. EDWARDS, AND JOHN EDWARDS *v.* FARMERS NATIONAL BANK AND ENOS C. FISH.

May Term, 1903.  Reargued, November Term at Rutland, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 7, 1910.

*Attachments—Attaching Defendant's Real Estate in a Town "Bounded as Said Town is Bounded"—Effect—Leases— Rights of Lessee—New Lease—Acceptance—Effect—Surrender of Lease—Effect—Breach of Terms of Lease—Forfeiture—Time—Preservation of Attachment Lien.*

Where a quarry lease covering certain specified real estate in the town of Wells was duly executed, witnessed, acknowledged, and recorded, an attachment in a suit against the lessees of "all the real estate with the appurtenances thereof with the defendants' right in equity to redeem the same, situate in said town of Wells, and bounded as said town is bounded, and of all the defendants' interest in the lease of the quarries in Wells," made by lodging a copy in the town clerk's office, was sufficient to create a valid lien on all rights and interest of the lessees in the land covered by the lease, but did not cover any rights that the lessees acquired from the same lessor in adjacent lands in that town, and on which they were then quarrying under a subsequent verbal arrangement with her.

Where tenants under a quarrying lease accepted a new lease of five-eighths of the same land and of other land adjacent thereto, and containing material provisions inconsistent with the old lease, touching all the land covered by the second lease, it constituted, as between the lessor and lessee, a surrender of the old lease by operation of law as to so much of the land within the old demise as was included in the new.

Voluntary surrender of an old lease by operation of law consequent upon the execution of a new one imposing different obligations, but not conditioned on such surrender, did not affect the lien of a prior attachment of the then existing rights of the lessees in the old leasehold estate.

Where a lessor made no attempt to forfeit a quarry lease for breach of a condition, until an attempted re-entry made two and three quarters years after the lessors had discontinued all work on the quarry, and during which time they were quarrying on the lessor's adjoining property under a verbal agreement with her conditioned on the payment of royalties in arrear under said lease, the attempted forfeiture was too late.

Where attachments were duly made of lessee's rights under a quarry lease, and executions levied on the attached property within five months after final judgments, the attachment liens were preserved.

APPEAL IN CHANCERY. Heard on pleadings and master's report at the March Term, 1903, Rutland County, *Stafford,* Chancellor. Decree for the orators. The defendants appealed. The bill seeks to restrain the defendants from selling the premises on their attachment liens, under executions issued within five months after rendition of final judgments, on the ground that a cloud would thereby be cast upon their title; and insisting that, if defendants can hold any interest of Schiff & Leonard in the premises, the orators have the right, as subsequent *bona fide* purchasers, to redeem the premises from that lien.

*S. E. Everts* for the orators.

The attachment does not describe, and therefore does not cover, any lands not embraced in the first lease. *Clemons* v. *Clemons,* 69 Vt. 545; *Pond* v. *Baker et al.* 58 Vt. 293.

If an agreement is such that the property is to remain in the lessor until the payment of the rent and no re-entry is required to vest in him, or if the right of the lessees does not become perfect until a certain part of the contract is performed, it will not be attachable as to the tenant. 4 Cyc. 566; *Paris* v. *Vail,* 18 Vt. 277; *Dickenson* v. *Ray,* 55 Vt. 62.

If debtor's primary interest is dependent on a contingency it is not attachable. 4 Cyc. 564. The right to attach an equitable interest is not denied, but it does not follow that every equitable interest is attachable. 4 Cyc. 560; *Chase* v. *York Co. Savings Bank,* 89 Tex. 316.

*O. M. Barber* and *J. B. McCormick* for the defendants.

A parol lease of a mine is valid where the lessee enters there-under and expends labor and money in preparations for mining. *Ruffati* v. *Societe Anonyme,* 37 Utah 591; 10 Utah 386; *Sheldon* v. *Davy & Jones,* 42 Vt. 637; *Holmes* v. *Caden,* 57 Vt. 111; *Felch* v. *Hooper,* 111 Mass. 52; *Davenport* v. *Lacon,* 17 Conn. 278; *Wallace* v. *Scoggins,* 17 Am. St. Rep. 749.

An attachment of the debtor's property of all the real estate in a given town is good to hold lands and real estate and all interest in real estate owned by the defendant in the town. *Young* v. *Judd,* Brayt. 151; *Clemons* v. *Clemons,* 69 Vt. 545.

The orators are not purchasers in good faith. They knew the extent of the possession of Schiff & Leonard. They knew of the attachments of the bank and that the suits were pending. They were put upon inquiry and it was their duty to pursue that inquiry with reasonable diligence and an honest desire to ascertain the truth. *Hackett* v *Callender,* 32 Vt. 97; *Gifford* v. *Bank,* 63 Vt. 114; *Hart* v. *Bank,* 33 Vt. 252; *Holmes* v. *Caden,* 57 Vt. 115; *Perrin* v. *Reed,* 35 Vt. 2; *Allen* v. *Gates,* 73 Vt. 222. And there can be no escape from the lease of Sept., 1890, as the attachment of that lease was in full force when the second lease was made, and the fact that the second lease covered the lands included in the first lease does destroy the lien of the prior attachment. *Downer* v. *Norton,* 19 Vt. 338; *Hyde* v. *Barney,* 17 Vt. 280.

WATSON, J. On September 6, 1890, Mary Jane Paul and Jemima Clark made and executed to William Leonard and Charles Schiff a lease of certain land therein described, being part of the Clark and Paul farm, situated in the town of Wells, for the sole purpose of quarrying and manufacturing roofing slate within and from the premises for so long as suitable material therefor could be found, or until the slate rock therein should be exhausted, together with all rights and privileges necessary and incidental to said business, the lessors reserving the full use for farming purposes of all that part of the leased premises which should not be in use in quarrying. The lessees therein covenanted to manufacture roofing slate from the premises as long as suitable material could be found for the purpose, and not to cease or suspend working under the lease for more than three months in any one year; to render to the lessors

quarterly in every year a full and true account in writing of the slate manufactured and of all stone for other purposes sold from the premises during the preceding three months; to pay to the lessors at the expiration of each such period the royalties stipulated in the lease, for the privilege granted; and in case of failure by the lessees to comply with any of these provisions the lease and all rights thereby granted, at the election of the lessors, should cease and be void, with the right of reentry upon and to repossess the premises as though the lease had not been granted.   This lease was executed with all the formalities required by law and was duly recorded in the town clerk's office of the town in which the land is situated.

On receiving this lease the lessees, under the firm name of Schiff & Leonard, entered upon the premises and began quarrying, manufacturing, and selling slate, thus continuing until about June, 1903, when, becoming convinced that the rock on the land within their demise was not of a character from which slate could be made at a profit, and that pay rock could be found outside of that territory on a strip of land a few rods wide to the south and adjoining, they moved their derrick onto this strip and opened a quarry there, called here the new quarry, which they continued to work until they transferred their subsequently acquired rights therein to Hughes as stated below.

About the time Schiff & Leonard thus moved their derrick, and from time to time thereafter during the progress of their work on the last named quarry, they applied to the lessor Mrs. Paul for a new lease, or change in the old one, to cover the quarry where they were then working, stating in substance that the opening and working of the first quarry had been to their great loss; that she ought to give them a chance to get their money back by opening and working this new one, which was apparently valuable.   Thereupon Mrs. Paul said in substance that if they would pay the back royalties due under the first lease, properly work the new quarry, make prompt reports and promptly pay the royalties as provided by the terms of the first lease, they might go on and continue to work the new quarry and she would protect them.   These conditions were agreed to by Schiff & Leonard and they, relying on this agreement, thenceforth worked only the new quarry.

Within the time when the work was thus going on under this verbal agreement, and on the 12th day of September, 1903, the attachments of the defendant bank were made. No claim is made but that they were good, and prior in point of time to the rights of the orators, so far as the premises covered by the lease of September 6, 1890, called here the first lease, are concerned. Their validity is questioned, however, as to the strips of land immediately south thereof, containing the new quarry.

It is unnecessary to determine just how Schiff & Leonard stood under the verbal arrangement with reference to the latter quarry, for assuming their relation to have been that of lessees, as claimed by the defendants, the attachments did not cover that property. The land attached is described in the return as "all the real estate with the appurtenances thereof, with the defendants' right in equity to redeem the same, situate in the said town of Wells and bounded as the said town is bounded." Such an attachment by copy in the town clerk's office was sufficient to create a valid lien on all the rights and interests of Schiff & Leonard in the real estate covered by the first lease, since to that extent their ownership appeared by the record of land titles, to which reference could be had for the precise property, or property rights and interests, referred to in the return, upon the principle that that is sufficiently certain which can be made certain. *Young* v. *Judd,* Brayt. 151; *Clemons* v. *Clemons,* 69 Vt. 545, 38 Atl. 314. But no right or interest had by them in land outside of the limits of that lease, under the verbal arrangement, was apparent of record,· hence as to such rights and interests the return was incapable of being reduced to a sufficient certainty, and no lien was created thereon. *Hoy* v. *Wright,* Brayt. 208. Nor did the attachment of "all of the defendants' interest in the lease of the quarries in Wells," even though this clause be construed as an intended attachment of defendants' interest in the premises covered by the lease, extend beyond the land described in the first lease; for the attachment of all the real estate, etc., situate in the town of Wells and bounded as the town is bounded, as the property of the defendants, relying upon the land records to aid in the description of the property intended to be attached, as above shown, indicates that the officer then had in mind the premises within the limits of the lease there recorded; and there is nothing in the case

indicating that in specifying "the lease" in the other clause of the return he intended any lease other than the one of record. Moreover, but one lease is referred to in this clause of the return, and if it were held that the reference may be either to the premises covered by the verbal lease or to those within the lease recorded, such a holding would render that part of the attachment void for uncertainty. See *Whitaker* v. *Sumner,* 9 Pick. 308; *Lambard* v. *Pike,* 33 Me. 141; *Porter* v. *Byrne,* 10 Ind. 146, 71 Am. Dec. 305.

On the 28th day of September, 1895, the landlady executed and delivered to William Leonard and Elizabeth Schiff, wife of Charles Schiff, a lease properly signed, sealed, and acknowledged. This lease, known as the second lease, was duly recorded on the 28th day of the following month. The name of Elizabeth Schiff was used therein instead of that of her husband as a matter of convenience among the parties, whatever interest she took being entirely for his benefit. And it was agreed on the trial before the master that for all purposes of this case, this second lease shall be regarded the same as if the name of Charles Schiff had been written therein wherever the name of Elizabeth Schiff appears; that all references therein to her shall be treated as if to him; and that all rights of the parties in this case shall be the same as if the lease had been made to and with him instead of her.

The second lease covers all the land within the limits of the first, except a strip six rods wide on the north, and includes additional land on the east, also on the south; and within its limits is the new quarry. The term and the general purpose of the second lease are like those of the first. To some other of their respective provisions advertence will be had in a later paragraph. January 16, 1896, Elizabeth Schiff and William Leonard, as composing the firm of Schiff & Leonard, by agreement in writing signed and sealed by them, and for a valuable consideration, sold and assigned to the orator Anthony Hughes the second lease together with the rights and privileges therein granted, free and clear of incumbrance. At that time defendants John Edwards and John W. Edwards held a lease of quarry rights upon all of the Paul and Clark farm, except the strip six rods wide on the north, and the part covered by the second lease. Hughes took his said assignment with the expectation and pur-

pose of forming a partnership with the Edwardses and merging their leasehold rights; but later ascertaining that there were royalties in arrear and that the provisions of the leases to Schiff & Leonard and to Leonard & Elizabeth Schiff had not been kept and performed by the lessees, he did not make a merger assignment, as had been contemplated. On the 5th day of March, 1896, Mrs. Paul and her husband made and executed to Hughes and the two Edwardses a lease covering quarry rights upon all of said farm, except a strip six rods wide on the north side, which lease six days later was duly recorded. It is found that at the time of the execution of this lease Hughes was in possession of the premises in question, and thereafter so continued with the Edwardses, operating under that instrument.

Judgments were rendered in favor of defendant bank in the two cases in which the attachments in question were made, at the March term, 1896, of Rutland County Court. That term was adjourned without day May 25, 1896. Executions were issued on the judgments September 24, 1896, and the same were levied on the land and premises described in the first and second leases, respectively. Yet since at the time of the levy Schiff and Leonard owned no right or interest in any of the real estate levied upon,—of which the execution creditor had at least constructive notice,—the levy in any event had force only to the extent of the validity of the attachment liens, which as we have seen did not extend outside of the premises described in the first lease; and it is argued that even as to these premises the attachment liens had been made inoperative by a reentry of the lessor for noncompliance by the lessees and their assigns with the terms of the lease.

It is found that Schiff & Leonard did not make reports as provided in the first lease, nor in accordance with the verbal agreement under which the new quarry was operated before the execution of the second lease; that they did not pay the royalties as required by the first lease, by the verbal agreement, or by the second lease. There is still due about four hundred dollars of royalties, a considerable part of which is for slate made and sold from the first quarry, and more for slate made and sold from the second quarry prior to the execution of the second lease. They were in default when the attachments were made, when the executions were levied, and ever after each to the present time.

Mrs. Paul from time to time during the working of the quarries by Schiff & Leonard made complaint that they did not pay for slate made and sold according to the agreements, and informed them that unless they did comply with such terms, and pay what they were in arrears, they must stop work, and that she would assert her right to terminate their lease. Yet she continued to receive whatever royalties Schiff & Leonard offered her, knowing they were continuing to work; and when she learned of their assignment to Hughes she called upon him to pay the back royalties, but he did not do so. No further action was taken in the matter until March 11, 1896, when she undertook to reenter upon the premises in question for breach of the conditions of the leases by the lessees and their assigns. It is contended by the orators that the first lease and all rights under it were terminated by this action of the lessor; whereas on the part of the defendants it is said that the pretended reentry was a proceeding instituted by the orators against themselves for the purpose of defeating the liens of the defendant bank under its attachments.

While the first lease was yet in force, except so far as its provisions may have been affected by the parties thereto entering into the verbal agreement relative to the new quarry and operating under it, the second lease from the lessor was accepted by the tenants, covering all the premises of the first except a strip on the north end six rods wide,—which strip was three-eighths of the whole land within the first lease,—together with additional territory on the east and also on the south. The new lease was for the same term, and for the same purpose, as the old; but by it an account of all slate made and sold was to be rendered by the tenants to the landlady monthly instead of quarterly as by the old lease, and by it the slate was newly classified, and the royalty to be paid materially reduced. The new lease contained a provision whereby the tenants agreed to pay the landlady four months' back royalty, then due, on a future day named, and other provisions for the lessor's benefit not before existing, with the right of reentry in case of failure to perform any of the conditions therein specified. It cannot be said that there was a surrender in fact of the premises or any part thereof covered by the old lease; yet we think the acceptance by the tenants of the new lease containing material provisions inconsistent with the

old lease, touching the rights and liabilities under the grant of five-eighths of the same premises, constituted a surrender by operation of law of so much of the land within the old demise as was included in the new as between the landlady and the tenants. Com. Dig. tit. Surrender, (I 2.) ; *Lyon* v. *Reed,* 13 M. & W. 285 ; *McDonnell* v. *Pope,* 9 Hare 705, 41 Eng. Ch. 705, 68 Eng. Reprint, 697 ; *Boynton* v. *Morgan,* 22 Q. B. D. 74·; *Holme* v. *Brunskill,* 3 Q. B. D. 495 ; *Dreyfus* v. *Hirt,* 82 Cal. 621, 23 Pac. 193 ; *John R. Davis Lumber Co.* v. *Milwaukee First National Bank,* 90 Wis. 464, 63 N. W. 1018.   However, the surrender being voluntary and not by a condition in the grant, it could not affect the interests of the attaching creditor previously created and then existing against the tenants, in the leasehold estate.   The governing principle of law is stated by Lord Coke as follows: "But having regard to strangers, who were not parties or privies thereunto, lest by a voluntary surrender they may receive prejudice touching any right or interest they had before the surrender, the estate surrendered hath in consideration of law a continuance." Co. Litt. 338. b.; and by Lord Comyns, "But the estate shall have continuance notwithstanding the surrender, to avoid a prejudice to a stranger." Com. Dig. tit. Surrender, (L. 3.) ; *Great Western Ry. Co.* v. *Smith,* (1876) 2 Ch. Div. 235 ; *Clements* v. *Mathews,* (1883) 11 Q. B. 808 ; *Firth* v. *Rowe,* 53 N. J. Eq. 520, 32 Atl. 1064 ; *Eten* v. *Luyster,* 60 N. Y. 252 ; *Farnum* v. *Hefner,* 79 Cal. 575, 21 Pac. 955, 12 Am. St. Rep. 174.   The question of what burdens and liabilities may go with such continuing estate, in equity, as against the person claiming under the lessee, is not presented by the facts of record.

At the time of entering into the verbal agreement Mrs. Paul knew that Schiff & Leonard had discontinued operations on their leasehold and had moved their derrick therefrom to the place of the new quarry.   She was told by them in substance that the business had been carried on at the former place at a heavy loss, and that they wished to be given a chance to retrieve such losses by quarrying and working at the new opening.   And the fact that they had not complied with the provisions of the first lease respecting continuous work, the rendition of accounts, and the payment of royalties, she well knew.   In these circumstances, we think the entering into the verbal agreements effected an intentional waiver by her of the right to insist upon the provision

first above named, and once waived it could not afterwards be a ground of forfeiture.  As no quarrying was subsequently done on the premises of the first lease, there was no occasion for rendering later accounts in connection therewith.  And the payment of the royalties in arrear was made one of the conditions of the verbal arrangement.  We need not consider whether by force of this arrangement all right of forfeiture for past failures to render account and to pay royalties according to the terms of the first lease were waived by the lessor; for if they were not, she could exercise such right only by acting promptly.  The so-called re-entry was her first attempt and this, being some two and three-fourths years after the discontinuance of all work on or at the old quarry, was too late for the right to be available.  *Van Dyke* v. *Cole,* 81 Vt. 379, 70 Atl. 593.

Nor could any right of forfeiture had by the lessor for non-compliance with the provisions of the second lease, nor any exercise of such right, affect the rights of the bank under its attachments; since as to such rights, we have already seen, the portion of the leasehold estate under the first demise, surrendered, in consideration of law had a continuance, and as to the other portion the record does not show that the term ever terminated, even as between the parties.

It follows that whatever may have been the effect of the lease of March 5, 1896, from the lessor to the orators, and of the subsequent so-called reentry by the lessor, as to the second lease and those having rights under it, the attachment liens were not affected thereby.  And since the executions were levied upon the property attached within five months after the rendition of the final judgments, the attachment liens were preserved and the bank is entitled to proceed under the levies according to law, to the satisfaction of its executions.

To the extent that the levies are here upheld the temporary injunction was wrongfully issued, should be dissolved, and the case retained below for the assessment of injunction damages, if any are claimed.  Beyond this, the levies being illegal, the temporary injunction was properly issued and should be made perpetual.

*Decree reversed and cause remanded with directions that a decree be entered in conformity with this opinion.  The de-*

*fendants to recover costs in this Court.  Let the costs below be there determined.*